Laeamoee, Judge,
delivered tbe opinion of tbe court:
Plaintiff sues for an increase in retirement pay under the Career Compensation Act of 1949, 63 Stat. 802.
Prior to entering on active duty witb tbe Army, plaintiff, in April 1942, was given a physical examination. At that time an X-ray of his chest was negative. He entered on active duty June 16, 1942. While stationed at Fort Clark, Texas, be bad a bad cold and was told that X-rays showed something on bis lungs but that this bad cleared up. Plaintiff left continental United States and reported for duty at Fort Eichardson, Alaska, in October 1944. He was transferred for duty to Attu in tbe Aleutian Islands where he remained from March until December 1945. He was transferred to Adak, Alaska, where he was hospitalized on December 16,1945. From there he was evacuated to the United States where he was briefly hospitalized at Madigan General Hospital, Takoma, Washington. He was then transferred to Bushnell General Hospital at Brigham City, Utah, and after *413 a few months there was transferred to the Fitzsimons General Hospital, Denver, Colorado, where he arrived about May 14, 1946. Plaintiff remained at Fitzsimons General Hospital until promoted to lieutenant colonel April 22,1947, and retired April 30,1947.
Pursuant to Army regulations, a disposition board composed of three medical officers was convened at the Fitzsimons General Hospital December 11,1946, and recommended that plaintiff be ordered before a retiring board. The retiring board, which consisted of five officers, two of whom were medical officers, after a hearing determined that plaintiff was permanently incapacitated for active service due to “Pulmonary fibrosis, diffuse, all lobes, both lungs, severe, cause undetermined.” The decision of the two boards that plaintiff should be retired was concurred in by the Surgeon General, and the Secretary of War approved the proceedings May 14,1947.
On May 14, 1947, plaintiff was certified by order of the Secretary of War, because of the aforesaid disability, to the Administrator of Veterans’ Affairs, for retirement pay in the amount of $288.75 monthly, effective May 1,1947.
Section 411 of the Career Compensation Act, supra, permitted members of the Armed Forces theretofore retired for physical disability to elect to compute their retired pay on the increased basic pay provided by the act, multiplied by their percentage of disability when retired, subject to a 75-percent limitation. Plaintiff applied for increased pay under that act. His application was considered by the Army Physical Review Council. The council rated him 30 percent disabled at the time of retirement. Plaintiff continued to receive 75 percent of his basic pay as provided. On appeal, the Army Physical Disability Appeal Board increased his disability rating to 60 percent and thereby his retirement pay was increased to $290.70 per month,[1] computed on the basis of the percentage of his disability.
Plaintiff was advised by the Adjutant General, acting for the Secretary of the Army, that the appeal board diagnosed plaintiff’s disability as “Fibrosis, pulmonary, diffuse, all *414 lobes, both lungs, severe, rated under Veterans’ Administration Code 6802 [for pneumoconiosis, unspecified], with a rating of 60 percentum.” Plaintiff appealed that determination, and it was reaffirmed by the Secretary of the Army.
After his retirement, plaintiff applied for and obtained a waiver of insurance premiums from the Veterans’ Administration, and in May 1949 he applied to the Veterans’ Administration for pension or disability. On May 18,1949, he was advised by the regional office of that agency at Lincoln, Nebraska, that his condition was disabling to warrant an evaluation of 100 percent, entitling him to compensation of $138 per month.
Plaintiff contends that he should have been rated under Diagnostic Code No. 6732 of the Veterans’ Administration Schedule of Eating Disabilities, which was used by the Veterans’ Administration on one occasion and which carried a 100-percent disability rating, and that the Army rating under Diagnostic Code No. 6802, with a 60-percent disability, was arbitrary, capricious, and erroneous.
He relies on the fact that the Army disposition board found him to be “permanently incapacitated for active service” and argues that this finding shows he was 100 percent disabled at that time. However, it was not the function of the disposition and retiring boards to determine the percentage of plaintiff’s disability. Their only function was to determine whether or not plaintiff was in fact incapacitated, together with the cause and date of incapacity, and whether or not it was an incident of service. Percentage of disability was of no consequence at that time. Furthermore, the fact that the disposition and retiring boards found plaintiff “permanently incapacitated for active service” did not mean that he was 100 percent disabled. To qualify for disability for retirement requires merely a showing that he was unfit to act as an officer. The Career Compensation Act, supra, provided in section 414 (a) that the Secretary of the Army was to determine the percentage of the officer’s disability.
Section 411 of the Career Compensation Act, supra, provides that the percentage of disability shall be determined as of the time he was retired, which in this case was May 14, 1947.
*415 Whatever finding the Veterans’ Administration made in relation to waiver of premium on life insurance, or any change in his physical condition, or any determination by the Veterans’ Administration as to percentage of disability, would be of no force and effect in this case. For the purposes of the Career Compensation Act, it was for the Secretary and his doctors, and not for the Veterans’ Administration and its doctors, to decide the degree of plaintiff’s affliction. Golding v. United States, 131 C. Cls. 677, 680; see also Holliday v. United States, 128 C. Cls. 647.
Veterans’ Administration Diagnostic Code No. 6802, above referred to, was the nearest to that which had been determined as the original cause of retirement. Therefore, there is nothing arbitrary, capricious, or erroneous in the determination by the Secretary of the Army.
The plaintiff’s petition will be dismissed.
It is so ordered.
MaddeN, Jvdge; Whitaker, Judge; LittletoN, Judge; and JONES, Ohief Judge, concur.
FINDING,S OP PACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a citizen of the United States, resided in Ansley, Nebraska, for many years and now resides in Seattle, Washington. He sues for an increase in retired pay to which he claims entitlement under the provisions of the Career Compensation Act of 1949, 63 Stat. 802.
2. After a physical examination at Fort Crook, Nebraska, on April 10, 1942, plaintiff entered on active duty as a commissioned officer June 16,1942. An X-ray film of plaintiff’s chest was negative at the time of the entrance examination. Plaintiff was on duty within the United States until early October 1944. He was stationed at Fort Bliss, Texas, for some time and attended The Judge Advocate General’s School at Ann Arbor, Michigan, in August 1943. After returning to duty at Fort Bliss he was transferred to Fort Clark, Texas, where he was on duty from about December *416 14,1943, to April 1944. At Fort Clark his quarters were in a ravine where it was very damp. He complained to the colonel in charge and obtained permission to move. At Fort Clark plaintiff had a bad cold for about two weeks and was told that X-rays showed something on his lungs but that this cleared up. The medical records at this installation were lost or destroyed and could not subsequently be located.
3. In early October 1944, the plaintiff left continental United States and reported for duty at Fort Richardson, Alaska. He was transferred for duty to Attu in the Aleutian Islands, where he remained from March until December 1945. He was transferred to Adak, Alaska, where he was hospitalized on December 16,1945, at the 179th Station Hospital. Upon examination of the plaintiff there, his condition was diagnosed as “Bronchiectasis, right lower lobe, moderate, cause undetermined.” He was accordingly evacuated by air to the United States, arriving at Tacoma, Washington, January 5,1946. He was there hospitalized at Madi-gan General Hospital from that date until January 17, 1946, when he was transferred to Bushnell General Hospital at Brigham City, Utah, where he was admitted on the next day. His condition while there was diagnosed as “Tuberculosis, pulmonary, hilar type, re-infection, chronic, moderately advanced, active.”
4. About May 14, 1946, plaintiff was transferred to the Fitzsimons General Hospital, Denver, Colorado, a hospital primarily devoted to the diagnosis and treatment of diseases of the respiratory system.
Plaintiff remained at the Fitzsimons General Hospital until his retirement except for various absences on “sick leave.” These absences included a period of about 60 days from December 27, 1946 to February 20, 1947, and an additional 60 days’ leave from March 1, 1947 to April 30, 1947, the date of his retirement. While awaiting retirement and under date of April 22, 1947, plaintiff was temporarily promoted to the grade of lieutenant colonel, Army of the United States.
5. The medical authorities at the Fitzsimons General Hospital where plaintiff had been under observation since May *417 14 or 15, 1946, diagnosed plaintiff’s disability as “Fibrosis, pulmonary, all lobes, botb lungs, severe; cause undetermined.” On March 1,1947, plaintiff was relieved from active duty effective April 30, 1947, upon expiration of 60 days’ leave.
6. Pursuant to Army Kegulation 40-590 an Army disposition board, composed of three officers of the Medical Corps, convened at Fitzsimons General Hospital December 11, 1946, and after careful consideration of clinical records, laboratory findings, and physical examinations, made the following diagnosis of plaintiff’s condition:
1. Fibrosis, pulmonary, diffuse, all lobes both lungs, severe, cause undetermined. (Unimproved) LCD: YES.
The board stated plaintiff was “Incapacitated because of left chest pain, chronic cough, dyspnea on slight exertion, and danger of aggravation by continued military service,” and recommended that he be ordered before an Army retiring board.
7. Pursuant to Army Regulations 605-250, plaintiff appeared before an Army retiring board convened at the Fitzsimons General Hospital December 26, 1946. The board consisted of 5 officers, 2 of whom were medical officers. After hearing testimony by the plaintiff and two medical witnesses and examining the pertinent records, the board concluded that plaintiff was permanently incapacitated for active service due to “Pulmonary fibrosis, diffuse, all lobes, both lungs, severe, cause undetermined.”
The board further found that the approximate date of origin or inception of the incapacitating defect was an “Unknown date subsequent to EAD,[1] 16 June 1942 and prior to 16 December 1945”; that the date the officer became incapacitated was 16 December 1945; that the cause was an incident of his service; and that his incapacity resulted from an incident of service.
8. The proceedings of the disposition and retiring boards were forwarded to the Surgeon General at Washington who advised the Adjutant General that he concurred in *418 the findings that plaintiff was (1) permanently incapacitated, (2) physically unfit for limited service, and (3) that the disability was not incurred in combat or as the result of an explosion of an instrumentality of war in line of duty. The proceedings were approved by order of the Secretary of War by the Adjutant General on May 14, 1947.
9. On May 14,1947, by order of the Secretary of War, the Adjutant General, because of the aforesaid disability, certified plaintiff to the Administrator of Veterans’ Affairs under the provisions of the Act of April 3,1939, for retirement pay in the amount of $288.75 monthly, effective May 1, 1947.
10. By Executive Order 10122, April 14,1950, 37 IT. S. C., § 284, the President, pursuant to the Career Compensation Act of 1949, promulgated regulations governing the payment of disability retirement pay, hospitalization, and reexamination of members and former members of the uniformed services and vested in the Secretary of the Army (or Secretary of the Air Force) effective July 1,1950, the functions of the Veterans’ Administration in administering the retirement pay acts.
By Executive Order 10124, April 25, 1950, 37 U. S. C. § 281,15 Fed. Beg. 2375, the President directed the Secretary concerned to determine and inform each member and former member of the uniformed services of his rights under the Career Compensation Act of 1949. The order also provided for a continuation of retirement pay being received September 30, 1949, unless prior to October 1, 1954, a different method was elected under section 411 of the act.
11. On April 25, 1950, the Adjutant General by order of the Secretary of the Army advised plaintiff that his application for increased retirement pay benefits under the Career Compensation Act had been considered, his case reviewed, and that he was rated 30 percent disabled at the time retired or granted retirement pay. His greatest benefits were established to be under the old pay schedule at $288.75 per month and to be tax exempt (this being three-fourths pay of a lieutenant colonel with three years’ active service credit).
On May 16, 1951, the Adjutant General by order of the Secretary of the Army advised plaintiff that in view of his *419 appeal from the findings of the Army Physical Eeview Council that he was 30 percent disabled at the time of retirement, the records in his case were transmitted to the Army Physical Disability Appeal Board which had decided “that the disability existent at the time of your retirement warrants an increase in your rating to 60 percent”, and that the board’s decision was final. This entitled plaintiff to $290.70 monthly computed on the percentage of his disability.
Under date of July 9,1951, the Adjutant General for the Secretary of the Army further advised plaintiff that
2. Your chest condition was diagnosed by the Army Physical Disability Appeal Board as Fibrosis, pulmonary, diffuse, all lobes, both lungs, severe, rated under Veterans’ Administration Code 6802, with a rating of 60 percentum.
By letter dated March 30, 1952, plaintiff further appealed this determination of the percentage of disability. After further review the Army Physical Disability Appeal Board adhered to its previous determination, and on April 15,1952, the Adjutant General by order of the Secretary of the Army so advised plaintiff, and stated that “the Department of the Army reaffirms its approval of the percentage of disability heretofore determined.”
12. From his retirement until April 30,1952, the plaintiff received retired pay of $288.75 per month which, due to a general statutory increase, was thereafter raised to $300.30 per month.
13. The clinical abstract of the plaintiff, which was attached to the disposition board proceedings and also to the retiring board proceedings referred to in findings 6 and 7, reads as follows:
BRIEF CLINICAL ABSTRACT
MAJOR EICHARD MACKEY, JAGD, 0 279 452
Brief medical history of the case: This officer entered the military service on a commissioned status 16 Jun 42. He was first hospitalized for his present illness 16 Dec 45 on Adak Island.
History reveals that on 1 Nov 44 after prolonged exposure in sub-zero weather following his arrival in Alaska, patient developed a severe cold with cough. He *420 was treated for sinusitis and given nose drops, but Ms cold continued and the cough increased. In March 1945 when transferred to Attu the cold cleared but the cough, which produced a small amount of mucoid sputum, continued. In July 1945 he developed sharp transient pain in the left chest over his heart and dyspnea on mild exertion. He was hospitalized and his sedimentation was found to be elevated to 19/60. X-ray revealed peribroncMal infiltration in the right lower and left upper lung fields. He was returned to duty after a week but had several x-rays as an out-patient. These reported a dense, apparently peribronchial infiltration in the right lower lung field adjacent to the cardiac border and in the left upper lung field at the 2d anterior costal interspace. Films a month later revealed no change. Bronchograms 26 Sep 45 were normal except that the bronchiolar filling stopped abruptly at the lower lung field at the area of infiltration. He was transferred to Adak 15 Dec 45 and hospitalized there the following day. Physical examination of the chest was normal except for moist rales heard over both bases following cough, more marked on the right. Chest film revealed increased markings of the hilar region and right lower lung field, part of which was due to retention of lipiodol. Several areas above the diaphragm were believed to represent a dilatation of the bronchi. Diagnosis of broncMectasis, right lower lobe, was made and patient was evacuated to the ZI. He was admitted to Bushnell GH 18 Jan 46 via Madigan GH. He caught another cold while enroute in an unheated train and again had sharp transient pains in the left anterior chest, chronic cough and dyspnea on slight exertion. Allergy work-up was nórmal. Sedimentation rate varied between 25-16mm in an hour. On28Mar46one sputum culture was reported to show acid fast bacilli, altho both Mantoux and coccidioidin skin tests were negative. Chest x-ray repealed a generalized accentuation of peribronchial marking and fairly heavy accentuation of the markings at the right base. Bronchograms were negative. During the first three months of 1946 he lost about 20 pounds. He had used nose drops of an undetermined type several times daily from 2 Nov 44 to May 1945, which he stated usually aggravated his cough; a lipoid pneumonitis was suggested. Patient continued having repeated colds during the spring of 1946, and was transferred to Fitz-simons GH 15 May 46 as a probable case of pulmonary tuberculosis.
*421 On admission here patient’s chief complaint was a moderate to severe cough productive of a small amount of mucoid sputum daily. He also complained of the transient sharp pain occasionally in the left chest over his heart, an occasional dull pain in the right side, and slight dyspnea which had increased. Despite a good appetite, he had lost weight, and he had slight dizziness after severe coughing. Physical examination revealed a few fine crepitant rales in the right lower lobe posteriorly but was otherwise essentially normal. Sar-coidosis was considered on admission but since a sputum at Bushnell had been reported positive for acid fast bacilli, patient was placed on three months bed rest to see if any improvement would result. Nothing of note occurred and he was gradually allowed to become ambulant. Plis chronic, dry cough continued.
In July 1946 a leukopenia of about 2,800 was reported with 50% polys and-82% lymphs, 7% monos, and 1% eosinophiles. Numerous high pitched rales were heard over the right base posteriorly. The red count dropped to between 3.6-S.9 million, and he was given a transfusion of 350cc whole blood. Patient stated that he felt no difference before or after the transfusion. Bone marrow study was not remarkable. He was finally placed on a saturated solution of KI and worked up to tolerance from 11 Oct to 4 Nov 46 with little change in x-rays or symptoms.
Mantoux and coccidioidin skin tests were negative on 1st and 2d strengths until 2 Nov 46 when the 1st strength coccidioidin was said to be possibly 1+. Histo-plasmin skin test was negative. Many sputa and gastric cultures for acid fast bacilli and fungi have all been negative. Sedimentation rate has averaged about 22/60 (Cutler). Total protein varied between 4.7-6.7. NPN was 18, urea nitrogen 18, icteric index 8.1. BMB was +14, cholesterol 303. WBC ranged between 2,800-3,500 most of the time with a normal differential. Bronchos-copy was normal 28 Jun 46; a repeat 28 Oct 46 revealed hyperemia of the trachea and bronchial tree with slight amount of mucoid sputum. ECGs were normal. Chest x-ray 20 May 46 revealed a patchy infiltration thru-out both lung fields, more marked on the right, and monthly serial films have shown no change. Induction film of 10 Apr 42 was obtained and shows a negative chest, x-rays of the esophagus, stomach and duodenum were normal. X-rays of the hands and feet, spine and skull were also negative.
*422 Patient’s course in this hospital has not changed, and it is felt that further hospitalization will be of no benefit.
14. After his retirement, the plaintiff applied for and obtained a waiver of insurance premiums by the Veterans’ Administration, and in May 1949, he applied to the Veterans’ Administration for pension or disability. On May 18,1949, he was advised by the regional office of that agency at Lincoln, Nebraska, that his condition was disabling to warrant an evaluation of 100 percent, entitling him to compensation of $138 per month under ordinary circumstances, with additional amounts provided in the case of dependents.
15. Plaintiff contends that he should have been rated under Diagnostic Code No. 6732 of the Veterans’ Administration Schedule of Rating Disabilities which was used by the Veterans’ Administration on one occasion and which carried a 100 percent disability rating, and that the Army rating under Diagnostic Code No. 6802 with a 60 percent disability was arbitrary, capricious, and erroneous.
The Veterans’ Administration Schedule for Rating Disabilities was issued pursuant to Veterans’ Regulation No. 3 (a) and provides as follows:
DISEASES OE THE DUNGS AND PLEURA TUBERCULOSIS

Rating

6701 Tuberculosis, pulmonary, chronic, far advanced, active.
6702 Tuberculosis, pulmonary, chronic, moderately advanced, active.
6703 Tuberculosis, pulmonary, chronic, minimal, active.
6704 Tuberculosis, pulmonary, chronic, active, advancement unspecified.
Symptomatic active pulmonary tuberculosis, substantiated by X-ray, laboratory and clinical evidence of activity at some time during the period of illness, and requiring hospitalization or bed rest of at least 16 hours a day, will be rated as totally disabling_100
Note. — During an initial period of activity, examinations will be scheduled at intervals of 6 months, for the first year, and thereafter at intervals

*423
Rating

of one year until 5 years have elapsed unless the disease becomes inactive within this period.

The following (a) to (g) inclusive, will be considered permanently and totally disabling, requiring reexamination at intervals of 30 months, until 5 years have elapsed, unless the disease becomes inactive within this period. [Emphasis supplied.]
(a) With continuous and progressive toxemia, as identified _ by loss of weight, emaciation, elevation of temperature, continuing throughout a period of 12 months or longer, with no improvement under proper supervision or treatment, and when it appears that the claimant will be unable to continuously follow a substantially gainful occupation_100
(b) Involving both lungs with large cavity formation in one or more lobes_100
(c) Associated with serious tuberculous complications, such as tuberculous ulcer-ative laryngitis, tuberculosis of the intestinal tract, of the genito-urinary tract, of the peritoneum, of the bones and joints, or of the meninges_100
(d) Far advanced, with involvement of three or more lobes and evidence of a marked tuberculous toxemia_100
(el Eeactivated cases, generally_100
(f) With definite advancement of lesions on successive examinations or while under treatment_100
(g) Without material improvement in 6 months hospitalization or without at least apparent arrest, in 12 months hospitalization _100
(h) Minimal, moderately advanced, or far advanced with marked impairment of function, local or constitutional severe symptoms or far advanced with moderate symptoms, over a period of years_100
(i) Far advanced, slight or no symptoms. 80
(j) Minimal or moderately advanced, moderate or slight or no symptoms_ 70

*424
Rating

6705 Tuberculosis, with pneumothorax, induced or artificial.
Note. — Bate as active tuberculosis for periods up to 3 years, d/wring which pneumo-thorax is continued; when pneumothorax is discontinued, or at the end of 3 years, observation by a hospital board will be required. If the disease is still active the rating will be continued; otherwise, rate for the inactive condition.
6711 Tuberculosis, pulmonary, chronic, far advanced, quiescent, or apparently arrested.
6712 Tuberculosis, pulmonary, chronic, moderately advanced, quiescent, or apparently arrested.
6713 Tuberculosis, pulmonary, chronic, minimal, quiescent, or apparently arrested.
6714 Tuberculosis, pulmonary, chronic, minimal, quiescent, or apparently arrested, advancement unspecified.
During continued hospitalization and following activity rate the above cited disease as active tuberculosis; these diagnoses are inapplicable except during hospitalization.
6721 Tuberculosis, pulmonary, chronic, far advanced, arrested or inactive.
6722 Tuberculosis, pulmonary, chronic, moderately advanced, arrested or inactive.
6723 Tuberculosis, pulmonary, chronic, minimal, arrested or inactive.
6724 Tuberculosis, pulmonary, chronic, arrested, or inactive, advancement unspecified.
Following moderately advanced or far advanced active tuberculosis, with history of activity over a period of 5 years, including at least 18 months hospitalization, with continued dyspnea on exertion, debility, and chronic invalidism_ 60
Note. — The above rating, though assigned on a permanent basis, will be subject to reexamination in 30 months.
For 6 months following hospitalization on account of active pulmonary tuberculosis_100
For a further 4i/£> years- 50
For a further 5 years- 30

*425
Rating

Note. — The 50 percent, SO percent cmd 20 percent ratings for arrested or inactive pulmonary tuberculosis will not be combined with ratings for other respiratory . disability. Following thoracoplasty, the rating will be for tuberculous pleurisy, (see pleurisy, following empyema); or for rib resection combined with the rating for collapsed hmg. Following far advanced active lesions, the permanent rating will be SO percent. Following moderately advanced lesions, the permanent rating, after 10 years, will be 20 percent, provided there is continued disability, dyspnea on exertion, impairment of health, etc., otherwise_ 0
$ $ ‡ $
6732 Pleurisy, tuberculous.
Active; rate as pulmonary tuberculosis. Kesiduals; rate as chronic pleurisy, following empyema, substituting tuberculosis for empyema.
NON-TTTBERCULOTTS DISEASES
‡ ‡ #
6802 Pneumoconiosis,[1] unspecified.
With extent of lesions comparable with far advanced pulmonary tuberculosis, cavity formation, pneumothorax, or severe pleural adhesions, and dyspnea at rest, poor response to exercise, or other evidence of marked impairment of bodily vigor-100
Severe; marked symptoms, dyspnea on slight exertion- 60
Moderate; more pronounced symptoms than below_ 30
Mild; slight cough, dyspnea, etc- 10
sh * * *
16. The first examination by Veterans’ Administration doctors in September 1948 resulted in a diagnosis of “Pul *426 monary fibrosis, all lobes, both, lungs, etiology unknown, severe.” It is noted that this diagnosis was made approximately a year and one-half after the plaintiff’s retirement. The physical examination at that time is quoted in part below:
Reveals a middle-aged white male who is well-developed and well-nourished, and who is coughing during the examination. His color is noted to be slightly bronzed. He is alert and cooperative. His temperature is 97.8; pulse 65, respiration 20; blood pressure 110/70; weight 188. Exercise tolerance is contra-indicated due to a mild dyspnea.
The plaintiff had informed the examining doctor, John G. Clothier, Chief of the Tuberculosis Section of the veterans’ facility at Lincoln, Nebraska, that he had recently consulted his physician at Belmont Hospital, Worcester, Mass., and on his return was examined at the Cleveland Clinic, and at both institutions he was told that his condition was pulmonary fibrosis of an undetermined origin, that he could expect nothing in the way of relief and could expect progression of his symptoms as time went by. These observations were concurred in by Dr. Clothier.
17. On November 22,1949, the plaintiff was examined for out-patient treatment purposes at a Veterans’ Administration facility at Omaha, Nebraska, by Dr. Maurice Pepper, internist. At that time his diagnosis of plaintiff’s condition was:
Pulmonary fibrosis, far advanced, probably active, nature uncertain.
On December 2,1949, the plaintiff was examined by Dr. Max Fleishman at the same Veterans’ Administration facility who diagnosed the condition of the plaintiff as:
Tuberculosis, Pulmonary, Far advanced, Active.
Thereafter, on December 15,1949, Dr. Maurice Pepper made the following handwritten note to the report of examination of November 22 referred to above:
Further study of this convinces me that this is definitely pulmonary tuberculosis and that pt. should be hospitalized & given streptomycin.
*427 18. In August 1950, the plaintiff was examined by Dr. J. Paul Board, Chief of the Tuberculosis Clinic at a Veterans’ Administration facility in connection with veterans’ education and training which the plaintiff was pursuing at the University of Texas Law School. The diagnosis was:
Pulmonary fibrosis, cause undetermined.
The report of physical examination at that time reads in part as follows:
BP: [Blood Pressure] 122/74. This is a well developed, well nourished, 49-year old, white male who does not appear ill. The chest is symmetrical and expansion is equal. Palpation and percussion are apparently normal. The breath sounds are harsh throughout both lungs and the expiratory phase of respiration is prolonged. No rales are heard. His chest x-ray of this date, compared with June 28, 1947, and June 8, 1948, shows improvement in the scattered infiltration throughout both' lungs except in the right and left 3rd interspaces. In these two areas there has been an increase in the fibrosis and peribronchial infiltration. His records indicate that . in December 1949 he had a negative tuberculin reaction.
19. On May 16, 1949, a Veterans’ Administration rating board, referring to the September 14, 1948 examination, rated the plaintiff 100 percent disabled from May 4, 1949, under Diagnostic Code No. 6732 for “Pleurisy, tuberculous”, although the diagnosis was “pulmonary fibrosis, both lungs, SEVERE, ETIOLOGY UNKNOWN.”
Thereafter on February 16,1951, a Veterans’ Administration rating board, referring to the December 2, 1949 examination (see finding 17),rated plaintiff’s disability at 100 percent from May 4, 1949, and as “0701 pulmonary tuberculosis, ear advanced, active (Formerly diagnosed and rated as pulmonary fibrosis, both lungs, severe,-etiology unknown).”
20. There is no showing in the record of any arbitrary or fraudulent action by the Secretary of the Army”'(or the Army Physical Disability Appeal Board) in arriving at the determination, as shown in finding 11, of the percentage of the plaintiff’s disability in accordance with the standard Schedule of Eating Disabilities in current use by tÜe Veterans’ Administration.
*428 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a., part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Changed to $300.30 by the general statutory Increase provided in the Act of May 19, 1952, 66 Stat. 79.

 Entrance on active duty.

 “A chronic fibrous reaction in the lungs to the inhalation of dust. It is attended by'fibroid induration and pigmentation.” (The American Illustrated Medical Dictionary„ Dorland, 22d Edition, 1951.)